WILLIAM ROBERTSON et al., Respondents, *v.* ALFRED SULLY,. Appellant.

GUARANTY — DISCHARGE OF GUARANTOR BY CHANGE IN GUARANTEED CONTRACT. Where, after a guaranty of a written contract of which it forms a part has been executed by the guarantor, his principal, without his knowledge or consent, adds a supplemental agreement to the contract, the guarantor is thereby discharged if, instead of being merely an additional stipulation on the part of the principal in case the guarantor fails to perform his agreement, the supplemental agreement materially changes. the guaranteed contract and the relations of the parties.

*Robertson* v. *Sully,* 2 App. Div. 152, reversed.

(Argued December 1, 1898; decided January 10, 1899.)

APPEAL from a judgment of the Appellate Division of the Supreme Court in the first judicial department, entered March 26, 1896, affirming a judgment for $45,995.30, endered against the defendant on the report of a referee.

The nature of the action and the facts, so far as material, are stated in the opinion.

*Elihu Root* and *Frank R. Lawrence* for appellant. The change in the written contract between the principal parties prevented the guaranty from taking effect. (De Colyar on Guaranties, 351; *Paine* v. *Jones,* 76 N. Y. 274; *People* v. *Vilas,* 36 N. Y. 459; *G. S. N. Co.* v. *Rolt,* 6 C. B. [N. S.] 550; *Page* v. *Krekey,* 137 N. Y. 307; *Smith* v. *Molleson,* 148 N. Y. 241; *Miller* v. *Stewart,* 9 Wheat. 680; *E. B. Co.* v. *Cooper,* L. R. [1 Q. B.] 75; *Benedict* v. *Cowden,* 49 N. Y. 396; *A. D. Co.* v. *Leavitt,* 54 N. Y. 35.) The referee erred in denying the defendant's motion to dismiss the complaint at. the close of the plaintiffs' case for the reason that no offer or readiness to retransfer to the defendant the debentures. deposited by him as collateral security for his guaranty was. shown. (*Dunham* v. *Mann,* 8 N. Y. 508; *Lester* v. *Jewett,* 11 N. Y. 453; *Dana* v. *King,* 2 Pick. 156; *Kelsey* v. *Crowther,* 162 U. S. 404; *Porter* v. *Rose,* 12 Johns. 209; *Green* v. *Reynolds,* 2 Johns. 207; *Johnson* v. *Wygant,* 11 Wend..

49; *Jones* v. *Gardner*, 10 Johns. 266; *Gazley* v. *Price*, 16 Johns. 267.)

*S. Hanford* for respondents. The memorandum indorsed by the Clarendon Company upon the contract in suit did not constitute an alteration of any obligation for which the defendant stood as surety, and the defendant's exception to the referee's ruling on that subject was not well taken. (*C. S. Bank* v. *Hyde*, 131 Mass. 77; *Huff* v. *Cole*, 45 Ind. 300; *Mayor, etc.,* v. *Kelly*, 98 N. Y. 472; *U. D. S. Bank* v. *Felty*, 25 Abb. [N. C.] 357; *Smith* v. *Molleson*, 148 N. Y. 241; *G. S. N. Co.* v. *Rolt*, 6 C. B. [N. S.] 550; *F. N. Bank* v. *Sleight*, 1 App. Div. 189.)

BARTLETT, J. This action was brought to enforce the written guaranty of the defendant to pay the plaintiffs a debt of seven thousand pounds and interest, due them from the Clarendon Land Investment and Agency Company, Limited.

Two defenses were interposed, among others: *First*, that the written contract between the principal parties, of which the contract of guaranty is a part, was materially changed without the knowledge or consent of the defendant; *second*, that there was no offer, before action brought, to return to the defendant certain debentures of the company, deposited by him under the contract as collateral security for his guaranty.

The plaintiffs reside in England, and the company is an English corporation; the defendant is a resident of this state.

The plaintiff Robertson and the defendant were holders of the debentures and stock of the company, and the former was a director at the time the agreement was executed, to enforce which this action is brought.

The agreement bears date the 29th day of October, 1889, and is between the company of the first part, the defendant of the second part, and the plaintiffs of the third part.

It recites that on the 29th day of July, 1886, an agreement was made between the defendant and the plaintiff Robertson,

whereby the defendant guaranteed the payment by the company of the principal sum of seven thousand pounds and interest, in accordance with the tenor of a coupon debenture of the company held by Robertson, and that fourteen thousand pounds of certain mortgage debentures of the company, then about to be issued to the defendant, should stand charged by way of collateral security with the payment of the principal sum and interest.

It further recites that all of the plaintiffs, at the request of the company and defendant, had agreed that the date of payment of the principal sum should be enlarged to the 12th day of August, 1892, upon the terms and conditions of the new agreement, which was in consideration of the premises and of the former agreement.

The debentures to be charged as collateral were to be deposited with Lloyd's Bank, Limited, at No. 72 Lombard street, in the city of London, so long as any part of the sum of seven thousand pounds, or any interest thereon, should remain unpaid, or until it should be necessary to enforce the charge by sale or otherwise. Upon repayment of the said sum and interest the debentures were to be transferred and delivered to the defendant or his nominees.

Some other provisions material to this controversy will be referred to later.

It appears that the company having executed the agreement, sent it to the defendant at the city of New York, and he signed and returned it to the company, its execution by Robertson and its delivery being somewhat delayed by Robertson's absence in Australia, caused by ill-health. When this agreement was delivered to Mr. Robertson to execute, it seems to have contained an addition thereto which never came to the defendant's knowledge until after the commencement of this action.

The agreement when executed by the defendant contained a fifth subdivision which provided that so long as any part of the seven thousand pounds remained unpaid the defendant was at all times to exercise his power and influence toward

keeping the plaintiff Robertson in the position as a director of the company. If Robertson from any cause ceased to be a director, before payment of the principal sum, the defendant obligated himself to purchase at par the shares of the company then owned by him.

This subdivision of the original agreement was changed as follows, by a supplemental memorandum dated December 31st, 1889 : " Memorandum supplemental to the within indenture : Whereas it was part of the arrangement under which the within written indenture was entered into that the company should enter into the agreement on its part hereinafter contained, but such provision was inadvertently omitted from the said within written indenture, and it is accordingly desired to vary the said indenture in manner hereinafter appearing.

" Now, it is hereby agreed as follows :

" I. There shall be added at the end of clause five of the said indenture the words following, that is to say : Provided always that if the said Alfred Sully, his executors or administrators, shall make default in purchasing the said shares, and having the same duly transferred to him or them, or if the company shall refuse to register such transfer, then, and in either of such cases, the company will, within seven days after such default or refusal, as the case may be, procure the said shares to be purchased at their par value by and transferred to some responsible transferee."

The original agreement as thus altered was in the possession of Robertson at the time of the trial and produced by him.

No evidence was offered to show that this memorandum was attached after delivery to Robertson of the original agreement, and the presumption stands that it was varied by the company before final delivery by adding the memorandum, based upon the same consideration.

The defendant swears that he had no knowledge of the alteration until after this suit was instituted, and no effort was made by the plaintiffs to prove the contrary.

The learned Appellate Division, in considering the effect of this added memorandum upon the rights of the parties, con-

ceded that if this agreement in any way changed the relations of the parties and at all injuriously affected the surety, he was undoubtedly discharged, whether the supplemental agreement is to be considered as part of the original contract or as an independent agreement.

It, however, reached the conclusion that there was no alteration in the contract which the defendant had guaranteed to perform, but that there were additional stipulations in respect of what the company would do in case the defendant failed to comply with his contract of guaranty as to the indebtedness mentioned in the agreement; defendant was to do nothing more; his obligation was not changed. It was an additional contract upon the part of the company in case the defendant failed to perform his agreement.

If this be the correct construction of the contract, then this judgment should be affirmed, but we are of opinion that the supplemental or independent contract wrought a change in the agreement guaranteed, as well as in the contract relations existing between the company and Robertson.

It becomes necessary at this point to look into the articles of association of the company and ascertain the precise relations which existed between the company and its creditor Robertson at the time of the execution of the agreement of October 29th, 1889.

Section 9 provides : " The directors may, from time to time, make such calls upon the members in respect of all moneys unpaid on their shares as they think fit."

This record discloses that the capital stock of the company had not been fully paid in.

Section 11 enacts in substance that a failure to pay the call subjects the holder of the stock to a rate of interest of ten per cent per annum until payment.

Section 14 provides : " The instrument of transfer of any share of the company shall be executed both by the transferor and transferee, and the transferor shall be deemed to remain the holder of such share until the name of the transferee is entered in the registry book in respect thereof."

Section 15 gives the form of transfer wherein the holder states that the transfer is "subject to the several conditions on which I held the same immediately before the execution hereof, and I, the said (transferee), do hereby agree to accept and take the said shares, subject to the conditions aforesaid."

Section 16 provides: "The directors may decline to register any transfer of shares unaccompanied by sufficient evidence to prove the title of the transferor, or any transfer made by a member who is indebted to the company, or under any liability to the company, or on the ground of such shares not being transferable consistently with any agreement made with the allottees or holders in respect thereof, or in the case of shares not fully paid up to a transferee of whom they do not approve, without being compelled to state their reasons for such disapproval."

Section 24 provides: "The company shall have a first and paramount lien on all the shares of stock of which any person is the holder, or one of the several joint holders, for all moneys due to the company from him, either alone or jointly with any other person, whether a member or not, and where a share of stock is held by more persons than one, the company shall have a lien thereon in respect of all moneys so due to them from all or any of the holders thereof, and the directors may refuse to register the transfers of any shares, whether fully paid up or not, or of stock by any holder or joint holders, who is, or are, or any one of whom is then indebted to the company, whether solely or jointly, with any other person, or on any account whatever.   *   *   *"

Thus it appears that, under these articles of association, the company was authorized to make calls upon its shareholders for amounts unpaid upon the stock, and enabled, by a refusal to transfer shares upon its books, to continue its lien on the stock, and to enforce payment, not only for calls that had been made, but those that might be necessary in the exigencies of the corporate business. In other words, the company was vested with the arbitrary power to prevent any shareholder from avoiding those obligations imposed upon him by reason of the fact that there was a balance still due

upon his shares.    When we consider that the debentures provided upon their face that payment was charged upon all the uncalled capital of the company, it becomes manifest that every debenture holder was interested in having the company preserve its lien on all stock in the hands of responsible parties.

It was one of the sources of corporate revenue to which the debenture holders had the right to look for payment.

This was the situation which existed when the defendant guaranteed the payment of the debenture for seven thousand pounds and interest held by the plaintiff Robertson.

This brings us to a critical examination of the supplemental or independent agreement which the courts below have held in no way affected the position of defendant as guarantor.

While we are inclined to agree with the Appellate Division that it is not important whether the added covenant between the company and Robertson be regarded as supplemental or independent, yet we are of opinion that, upon its face and on the facts disclosed, it was supplemental; was to supply an omission in the original agreement, and rested upon the same consideration.

The memorandum opens with the recitation: " Whereas, it was part of the arrangement under which the within written indenture was entered into that the company should enter into the agreement on its part hereinafter contained, but such provision was inadvertently omitted from the said within written indenture, and it is accordingly desired to vary the said indenture in manner hereinafter appearing."

It is clear from this language that Robertson regarded the omitted covenant as of value to him, and the company recognized the fact that he was entitled to it.

The material words of the covenant are that in case defendant, or his executors or administrators, made default in purchasing Robertson's shares under the conditions named, "and having the same duly transferred to him or them, or if the company shall refuse to register such transfer, then and *in either* of such cases the company will, within seven days after such default or refusal, as the case may be, procure such shares

to be purchased at their par value by and transferred to such responsible transferee." It would seem as if this language was perfectly clear and deals with an alternative.

The decision below proceeds upon the theory that it deals wholly with defendant's default and provides for an additional security to Robertson by the company in that event.

Manifestly this is giving but partial effect to the covenant, which does indeed contain the meaning ascribed to it by the court below, but it also provides for the contingency of the defendant fully performing his agreement with Robertson in the purchase of his stock and the refusal of the company to transfer notwithstanding that fact. The covenant deals with " either of such cases."

What then is the effect of this covenant in case the defendant offered to purchase Robertson's stock, as he was bound to do if the latter from any cause ceased to be a director, but coupled that offer with the lawful demand that the stock should be transferred to him free from all liens of the company ?

It is obvious that unless this demand of a clear title was complied with, it was greatly to the interest of defendant, as well as his strict legal right as guarantor of one debenture, and as owner of others, that the company should exercise its power of refusal to transfer the stock and hold Robertson to his full liability as shareholder.

In executing the supplemental covenant the company deprived itself of the power to thus coerce Robertson in the interest of the defendant as guarantor of its debenture, and agreed that within seven days after their refusal to transfer Robertson's stock to defendant, it would furnish a responsible purchaser of the stock at par and transfer it to him. This must be held to mean a transfer upon the books of the company.

The company had no right to waive its lien upon Robertson's stock for unpaid calls and such other liabilities as he rested under as a shareholder, whose stock the company might refuse to transfer upon its books.

Unless this covenant meant that the company would furnish a purchaser for Robertson's stock and register the transfer in its books, the execution of it was an idle ceremony, of no possible benefit to Robertson.

Such a registered transfer on the books would vest the title of the stock in the purchaser discharged of all liens of the company.

The consent of the company to this transfer is an act of absolute waiver.

The Supreme Court of the United States (*National Bank* v. *Watsontown Bank*, 105 U. S. 217, 222) declared that the " transfer, when thus consummated, destroys the relation of membership between the corporation and old stockholder with all its incidents and creates an original relation with the new member free from all antecedent obligation." (See, also, *Hill* v. *Pine River Bank,* 45 N. H. 300, 308 ; *Stebbins* v. *Phenix Fire Insurance Co.*, 3 Paige, 350 ; Morawetz on Private Corporations, § 207; Jones on Liens, § 403 ; Cook on Stock and Stockholders, § 531.)

The effect of the added covenant to the original agreement was, therefore, to materially change the contract guaranteed and the agreement between the principals as well.

It follows that the defendant is discharged from his contract of guaranty.

As the conclusion we have reached may render a second trial of this case unnecessary, it is not important to consider the alleged failure of plaintiffs to tender to the defendant the debentures put up as collateral before suit was begun.

No such tender was called for, we think, under the provisions of the agreement of 1889 already quoted.

These collaterals, if of any value, are presumably in the custody of the Lloyd's Bank, Limited, London. The statement of the plaintiff Jupp, when on the stand, that the company was in bankruptcy and the collaterals had been presented by the plaintiffs in the liquidation proceedings as a claim against the estate, does not necessarily imply that the bank has parted with the custody of them, and if it has, it would doubt-

less be liable for their full value on failure to produce upon defendant's demand.

The judgment should be reversed and new trial ordered, with costs to abide the event.

All concur, except Gray, J., absent.

Judgment reversed, etc.